UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FELECIA A. REDDING,<br><br>   *Plaintiff*,<br><br>  v.<br><br>LLOYD AUSTIN,[1]<br><br>   *Defendant*. | Civil Action No. 16-2149 (TJK) |

## MEMORANDUM OPINION

  Felecia Redding is an African-American woman who works in human resources at the Defense Intelligence Agency ("DIA"), a component of the Department of Defense. In 2013, she interviewed for a role as a senior human resources manager, but the DIA passed on her application in favor of Aradhana Nayak-Rhodes, a fellow employee who was younger and Asian-American. Redding filed this action against the Secretary of Defense, claiming age discrimination in violation of the Age Discrimination in Employment Act as well as racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. Redding alleges, among other things, that Defendant's qualifications-based reason for hiring Nayak-Rhodes over her was pretextual because she was substantially more qualified than Nayak-Rhodes. This Court previously dismissed Redding's retaliation claim, ECF No. 19, and Defendant has now moved for summary judgment on the remaining discrimination claims. For the reasons explained below, the Court will grant Defendant's motion and enter summary judgment in his favor.

---

[1] Defendant Lloyd Austin, who assumed office as Secretary of Defense in January 2021, is automatically substituted for Jim Mattis under Federal Rule of Civil Procedure 25(d).

I.      **Background**

In 2013, a reorganization in the Defense Intelligence Agency (DIA) Office of Human Resources (OHR) resulted in the creation of an "Employee Mobility" division. *See* ECF No. 37 at 2 ("Admitted Material Facts") ¶ 1. Warner Eley, an African-American man about three years younger than Redding who had been hired as the new Chief of Employee Mobility, was tasked with "implement[ing] a more strategic approach for utilizing human capital within DIA that looked at how to move people across the agency in a proactive manner that anticipated need, identified talent and moved that talent in the most effective manner possible." *Id.* ¶¶ 4–5. One of the first steps in standing up this new function required hiring a Deputy Chief of Employee Mobility to assist Eley, because his deputy in his prior position, who would have as assumed the new deputy position, was reassigned within OHR. *Id.* ¶¶ 6–7.

Deborah Hartman, the Director of OHR, was about a year older than Redding. According to Hartman and Eley, Hartman "was looking for someone to fill the Deputy Chief of Employee Mobility position who had strategic management experience consistent with the mission of the Employee Mobility Division." *Id.* ¶ 9.[2] Positions in the DIA OHR are classified by billet. Each series of billet aligns with a set of skills and job expectations. Eley, for example, was assigned to be the first Chief of Employee Mobility with a GG-301-15 series billet appropriate for a "Supervisory Human Capital Advisor position." *Id.* ¶ 3. Eley's deputy in his prior position also held a GG-0301-15 Supervisory Human Capital Advisor billet. *Id.* ¶ 8. When

---

[2] Redding denies this assertion and several others because they are unsupported by "contemporaneous evidence." *Id.* ¶ 9. But there is no requirement for a purported fact to be supported by contemporaneous evidence, as opposed to sworn testimony. *Salazar v. Wash. Metro. Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005). And in any event, the Court includes these assertions here merely to reflect Defendant's stated reasons for filing the position as it did. As explained below, Redding argues, based on other evidence, that this reasoning is pretextual.

it came time to hire a Deputy Chief of Employee Mobility, three billets were available to support the position.  *Id.* ¶ 10.  But according to Hartman, none of those billets fully aligned with the Deputy Chief position.  *Id.* ¶ 11.[3]  Because "time was of the essence to get the position advertised, [and] management did not have the time to go through the process of having the billet reclassified" to more closely align with the position that management envisioned, *id.* ¶ 12, it used an existing GG-0201-15 billet, associated with a Supervisory Human Resource Specialist position, *id.* ¶ 13.  According to Eley, "a GG-0201 series position is one focused more on the technical aspects of human capital positions rather than on strategic management."  *Id.* ¶ 14.  In any event, according to Hartman and Eley, "it was management's intention to change the position to match the type of work that was being performed once the position was filled."[4]  *Id.* ¶ 33.

In April 2013, Eley provided a staffing checklist to Human Resources to help identify staffing requirements.  In answering the question "What knowledge, skills, and/or abilities are required to perform the duties of this position?," Eley wrote:  "Responsible for organizing, planning, supervising and directing work through subordinate supervisors of human resources specialists responsible for execution of highly complex DIA human capital programs. Exercises broad responsibility and authority for planning and managing the overall efficiency and effectiveness of assigned operations and communicating the strategic plan, mission, vision and values to employees within the directorate(s). - Oversees through subordinate experts/supervisors

---

[3] Redding also denies this assertion and says it is unsupported by "contemporaneous evidence." *Id.* ¶ 11.

[4] Again, Redding denies this assertion as unsupported by "contemporaneous documentary evidence." *Id.* ¶ 33.

various special projects to meet unique customer and headquarters requirements." *Id.* Eley also answered the question "What knowledge, skills, and/or abilities would distinguish candidates with superior qualifications from those who meet only basic qualifications?" as follows: "Candidates MUST possess senior level staffing experience, and has [sic] previously served in a variety of complex HR assignments, additionally, exercises technical and administrative supervision over human resources professionals with a thorough knowledge of a wide range of concepts, principles and practices to advise or independently accomplish the establishment and implementation of practices, polices [sic] and procedures." ECF No. 37-3 at 2.

On April 17, 2013, the DIA internally advertised the Deputy Chief of Employee Mobility position, described as a Supervisory Human Resources Specialist, GG-0201-15. Admitted Material Facts ¶ 15. The Vacancy Announcement listed the following Mandatory Assessment Factors for the position:

"1. (U) Establishes working relationships with senior leaders within and across other agencies and private organizations in order to advance corporate and community goals

2. (U) Develops change strategies, including recommending innovative solutions to human capital issues while minimizing unintended consequences

3. (U) Knowledge of the DIA Strategic Plan, to include its goals and objectives

4. (U) Senior level staffing experience exercising technical and administrative supervision over human resources professionals with a thorough knowledge of a wide range of concepts, principles and practices, policies and procedures." ECF No. 33-2 at 15.

According to Hartman, the position was not advertised as she had intended because all human resources employees were not on the email distribution list, and the announcement did

4

not indicate that it was open to GG-0300 series employees. *Id.* ¶ 16. On May 1, 2013, Hartman directed that the distribution list be updated to include all human resources employees and the position be "advertise[d] [to] HR [employees] only as both 201 or 301." *Id.* ¶ 17. On May 2, 2013, the original vacancy announcement was re-issued to all human resources employees, but the announcement still failed to indicate that it was open to GG-0300 series employees. *Id.* ¶ 18.

At the time of the announcement, 52-year-old Felecia Redding worked as a supervisory Human Resources Specialist. ECF No. 37 at 16 ("Pl. Additional Facts") ¶ 9. As she explains, she had "7 years of senior level staffing experience and 9 years of experience supervising civilian employees with 17 years of experience supervising military personnel." *Id.* At that same time, Aradhana Nayak-Rhodes, a younger Asian-American woman, was serving as Deputy Staff Director within OHR. ECF No. 33-2 at 30. In that capacity, she served "as a second-level supervisor and senior administrative advisor on matters pertaining to the day-to-day operations or management of administrative support functions" within OHR. *Id.* She had prior experience as Chief, Strategic Initiatives, within the Directorate for Human Capital at DIA, and she also had experience as a Staff Officer. Admitted Material Facts ¶ 27.

Redding, Nayak-Rhodes, and seven other individuals applied for the Deputy Chief position. Belinda Payne and Veronica Mason, human resources staffing specialists, screened the applications and referred only six applicants to Eley. *Id.* ¶ 19. The referred candidates, including Redding, were all working in series GG-0201 positions. *Id.* ¶ 20. The staffing specialists screened out Nayak-Rhodes and two other candidates in GG-300 series positions, on the basis that their resumes did not reflect "staffing/operational experience." *Id.* ¶ 21.

According to Eley, the selecting official for the vacancy, "the human resources staffing consultants who screened the applications erroneously determined that GG-0201 series staffing

5

experience was a requirement for the position," *id.* at 23, and he directed the specialists to provide him with all the received resumes, *id.* at 25.  Ultimately an interview panel composed of Eley, Melissa Hawkes, and Steven Rush, interviewed all nine applicants.  *Id.* ¶ 29.  Each panel member independently gave Nayak-Rhodes their highest rating and ranked Redding and Kenneth Chalk, in that order, as the next two highest-rated candidates.  *Id.* ¶ 30.  Redding does not contend that Hawkes or Rush acted with discriminatory animus towards her in connection with the selection process.  *Id.* ¶ 31.  The interview panel selected Nayak-Rhodes for the Deputy Chief Employee Mobility role, under the formal title of Supervisory Human Resource Specialist, GG-15-201.  *Id.* ¶ 34.[5]  Within two months, her position was converted to a Supervisory Human Capital Advisor GG-15-301 position similar to the position held by Eley and his prior deputy.  *Id.*

On June 12, 2013, Redding contacted an EEO counselor to initiate a discrimination complaint related to her non-selection.  And on October 26, 2016, Redding filed this suit against the Secretary of Defense.  Her operative complaint brings two counts against Defendant, each alleging a different type of unlawful conduct: Count I alleges unlawful race and age discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* and Count II alleges Retaliation in violation of both Title VII and ADEA  ECF No. 11.  In 2018, this Court dismissed Count II without prejudice.  ECF No. 19.  And last year, the Defendant

---

[5] Redding suggests that there are factual disputes about Hartman's exact role in the final stage of the hiring process.  She points to testimony about Hartman's role as "approving the selection made by the interview panel" as contradicting Eley's testimony that he "recommended to Ms. Hartman that she select Nayak-Rhodes."  Pl. Opp. at 13.  The Court finds no material factual dispute on this point.

moved for summary judgment on the remaining age and race discrimination claims contained in Count I.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Summary judgment is appropriately granted when, viewing the evidence in the light most favorable to the non-movants and drawing all reasonable inferences accordingly, no reasonable jury could reach a verdict in their favor." *Lopez v. Council on Am.-Islamic Rels. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016). To survive summary judgment, a plaintiff must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation omitted). Courts "are not to make credibility determinations or weigh the evidence." *Lopez*, 826 F.3d at 496 (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)). But the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Lopez*, 826 F.3d at 496 (emphasis omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## III. Analysis

Under Title VII of the Civil Rights Act, all "personnel actions affecting employees or applicants for employment" in executive agencies "shall be made free from any discrimination based on race." 42 U.S.C. § 2000e-16(a). Likewise, the Age Discrimination in Employment Act

provides that "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a. "Where, as here, the plaintiff has no direct evidence that the adverse employment action[] of which she complains w[as] caused by prohibited discrimination," the Court applies the *McDonnell Douglas* burden-shifting framework. *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)). That framework first requires Redding to show that: "(1) she is a member of a protected class; (2) she applied for and was qualified for an available position; (3) despite her qualifications she was rejected; and (4) someone filled the position." *Lathram*, 336 F.3d at 1088 (cleaned up). Defendant does not dispute that Redding satisfies this minimal burden—she is African-American, she applied and was qualified for the Deputy Chief position, and she was ultimately rejected when Nayak-Rhodes was selected for the role. In response, Defendant must "assert[ ] a legitimate, non-discriminatory reason for the decision" not to hire Redding. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). And, as Redding concedes, Defendant has done so here by pointing to the assessment of the interview panel that Nayak-Rhodes was more qualified. Pl. Opp at 6.

The Court must therefore "resolve one central question," considering "all relevant evidence presented by" Redding and the government: has Redding "produced sufficient evidence for a reasonable jury to find that the [defendant's] asserted non-discriminatory reason was not the actual reason and that [it] intentionally discriminated against [her] on the basis of race [or age]"? *Brady,* 520 F.3d at 494–95. In other words, has Redding shown that Defendant did not "honestly and reasonably believe[ ]" that Redding was the more qualified candidate? *Id.* at 496.

Redding challenges as pretextual Defendant's qualification-based explanations for selecting Nayak-Taylor over her. In a non-selection case, a plaintiff can satisfy her burden of

demonstrating pretext by showing that "a reasonable employer would have found the plaintiff to be significantly better qualified for the job." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998); *see also Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 458 (2006) (citing *Aka*'s "significantly better qualified" standard). Redding tries to do so in two main ways.

First, Redding argues that Nayak-Rhodes was not even "minimally qualified" for the Deputy Chief Employee Mobility job. ECF No. 37 at 19 ("Pl. Opp.") at 6–7. She points to the job listing, which includes a series of four "mandatory assessment factors." Focusing on the fourth factor—"Senior level staffing experience exercising technical and administrative supervision over human resources professionals with a thorough knowledge of a wide range of concepts, principles and practices, policies and procedures," *see* ECF No. 33-2 at 15—she contends that Nayak-Rhodes did not have the "senior level staffing experience" required.[6] In her view, that phrase meant "technical staffing experience," *i.e.*, direct supervisory experience over employees engaging in the staffing process. Thus, she says, Nayak-Rhodes did not meet the minimum requirements for the position, and so by default she was substantially more qualified. Pl. Opp. at 6–8.

The problem for Redding is that Defendant had a different view of the position it was filling. And this Court "must not second-guess an employer's initial choice of appropriate qualifications; rather the court defers to the employer's decision of what nondiscriminatory qualities it will seek in filling a position." *Jackson v. Gonzales*, 496 F.3d 703, 708 (D.C. Cir.

---

[6] Redding also notes that Eley used the same phrase—"senior level staffing experience"—in the staffing checklist as a required criterion for the job.

2007) (cleaned up).[7]  According to Hartman and Eley, the job did not require technical staffing experience, and so Nayak-Rhodes's higher-level staffing experience also minimally qualified her under the fourth assessment factor.  Thus, the Deputy Chief position listing's use of the phrase "senior level staffing experience" included a higher-level managerial understanding of staffing.  *See* ECF 33-3 at 5 (explaining that the ideal Deputy Chief candidate did not "have to be the practitioner or the technical tactical person to have knowledge of how that system works").  According to Eley, this sort of "senior level staffing experience" "can be gained through series 0300 positions that are involved in various human capital issues."  ECF 33-2 at 3.

     Redding, to be sure, disputes all this.  But once an employer has articulated a non-discriminatory explanation for its action, as Defendant has here, the issue is not "the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers."  *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *McCoy v. WGN Cont'l. Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).  Notwithstanding Redding's own interpretation of the phrase "senior level staffing experience," there is no evidence that suggests Hartman and Eley did not honestly believe that the kind of staffing experience Nayak-Rhodes possessed would fit the bill.  In fact, to the contrary, how the hiring process unfolded overwhelmingly suggests that they believed that from the start, especially as they focused on strategic management experience as the more important factor for the Deputy Chief position.[8]

---

[7] Further, "employers are not rigidly bound by the language in a job description." *Browning v. Dep't of Army*, 436 F.3d 692, 696–97.  [full cite needed]

[8] To the extent that Redding argues that the entire process Defendant used to fill the Deputy Chief role creates an inference of discrimination, her argument fails.  She has not shown that the procedures here were "so irregular or inconsistent with [Defendant's] established policies as to

To begin with, the parties agree that Eley was tasked with "implement[ing] a more strategic approach for utilizing human capital within DIA" and that "[o]ne of the first steps in standing up the employee mobility capability was to hire a deputy to assist Mr. Eley in that effort." Admitted Material Facts ¶ 6. Hartman testified that, from the beginning she was looking for someone "who had strategic management experience consistent with the mission of the Employee Mobility Division." *Id.* ¶ 9. She also represented that because of time pressure, the plan was to use a billet that did not quite align with the position, but to change the position to match the work that was being performed once the position was filled. *Id.* ¶ 33. Consistent with these representations, she instructed that the position be advertised to not only those employees holding GG-201 series positions, which are "focused more on the technical aspects of human capital positions rather than on strategic management," but to those holding GG-301 series positions, like Eley and his former deputy. *Id.* ¶ 14. Eley then overruled the staffing specialists' assessment of the fourth mandatory assessment factor as requiring "staffing/operational experience," and their rejection of the three candidates holding GG-301 series positions; thus, the panel interviewed all nine candidates.[9] The panelists, two of whom Redding does not accuse of

---

make its hiring explanation unworthy of belief." *Porter v. Shah*, 606 F.3d 809, 816 (D.C. Cir. 2010). And even if a court suspects that a job applicant "was victimized by . . . poor selection procedures" it may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive." *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982). Finally, to the extent that there are factual disputes as to some aspects of the process, such as whether and how Hartman may have encouraged Nayak-Rhodes to apply for the Deputy Chief role, they do not create an inference of discrimination. *See Lopez,* 826 F.3d at 496 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[9] Redding points to the staffing specialists' decision to screen out Nayak-Rhodes and two other candidates as evidence that Nayak-Rhodes was not "minimally qualified" for the Deputy Chief role. But that would ignore the "necessary and appropriate realities of hiring processes" that are self-evident here. *Jackson*, 496 F.3d at 709. Hartman and Eley created the position and its

11

discriminating against her, found that Nayak-Rhodes was far more than minimally qualified for the job, despite one of them noting her lack of technical staffing experience. ECF No. 33-4 at 7. Finally, Defendant reclassified the Deputy Chief position from a 201 series billet to a 301 series billet shortly after Nayak-Rhodes' selection.[10] In sum, none of this suggests that Hartman and Eley did not honestly believe that the kind of staffing experience Nayak-Rhodes had counted as "senior level staffing experience," or otherwise supports an inference of discrimination.

Second, Redding argues, apart from whether Nayak-Rhodes was minimally qualified, the reason Defendant gave for preferring her—strategic management experience—was pretextual. Redding points again to the job posting, which she argues does not reflect this criterion, thereby suggesting that it was pretextual. But to repeat, this Court "must not second-guess an employer's initial choice of appropriate qualifications; rather the courts defer to the [employer's] decision of what nondiscriminatory qualities it will seek in filling a position." *Jackson*, 496 F.3d at 708 (cleaned up).

On this point, this case is quite similar to *Jackson*. In that case, the plaintiff challenged his non-selection for a promotion at the Bureau of Prisons. The Bureau's selection process gave

---

qualifications. Admitted Material Facts ¶ 9, 24. In contrast, the staffing specialists' understanding of the position was entirely subordinate to theirs, and the staffing specialists had merely relied on the job posting drafted by Eley, including the billet, to assess the qualifications of the candidates. *Id.* ¶ 19, 21, 23, 24. Finally, nothing in the record suggests that Eley did not have the authority to overrule the staffing specialists' screening decision to ensure that all the candidates he believed were minimally qualified were interviewed.

[10] Although Redding disputes that the reclassification was planned from the beginning, she offers no evidence to the contrary. Admitted Material Facts ¶ 33. And in addition to sworn statements from Hartman to that effect, Defendant also cites documentary evidence from when the position was first advertised acknowledging that the billet would need to be changed eventually. ECF No. 33-6 at 3. Finally, while Redding argues that the reclassification did not happen until after she contacted an EEO counsellor, the evidence shows otherwise. ECF No. 40-2 at 4.

heavy weight to the selectee's experience with its data management system. *Id.* at 705. Jackson argued that because such experience was not expressly referenced in the job description, a reasonable jury could disbelieve the Bureau's reliance on it. *Id.* at 708. But the Circuit held that "[t]he fact that an employer based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment." *Id.* at 709.

So too here. The posting announced that the job would be "[r]esponsible for organizing, planning, supervising and directing work through subordinate supervisors . . . responsible for execution of highly complex DIA human capital programs. Exercises broad responsibility and authority for planning and managing the overall efficiency and effectiveness of assigned operations and communicating the strategic plan, mission, vision and values to employees . . . Exercises a high degree of originality and judgment in accomplishing responsibilities that contribute significantly in guiding and shaping the future of the Agency." *See* ECF No. 33-2 at 14–15. To be sure, it is a general description that does not use the specific phrase "strategic management." But it reflects that the job was strategic in nature. "[T]hat an employer based its ultimate hiring decision on one or more specific factors encompassed within a broader and more general job description does not itself raise an inference of discrimination sufficient to overcome summary judgment." *Jackson*, 496 F.3d at 709. And for the same reasons described above, nothing in the record calls into question that this reason was genuinely held, or suggests pretext.[11]

---

[11] Redding also suggests that strategic management experience is a subjective criterion and therefore a "ready mechanism for discrimination." Pl. Opp. at 11. She claims that consideration of that kind of experience could allow the jury to infer that Eley and Hartman "resorted to subjective criteria because they knew that Ms. Redding objectively had more experience . . ." *Id.*

13

Even if Redding cannot show pretext in either Defendant's decision to consider Nayak-Rhodes as minimally qualified under assessment factor four, or to strongly weigh strategic management experience, as noted above, she could still show pretext by showing that she was "significantly better qualified" so as to allow a reasonable jury to "legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Aka*, 156 F.3d at 1294.  But she never tries to do so, at least not without rearguing that her employer should have substituted *her* conception of the Deputy Chief of Employee Mobility position for her employer's.  In any event, the record does not reflect that she was significantly better qualified than Nayak-Rhodes for the actual position Defendant intended to fill.

**IV.   Conclusion**

For all these reasons, Defendants' Motion for Summary Judgment, ECF No. 33, will be **GRANTED**.  A separate order will issue.

/s/ Timothy J. Kelly<br>
TIMOTHY J. KELLY<br>
United States District Judge

Date: March 10, 2021

---

But strategic management experience is not particularly subjective.  Perhaps reflecting that, Redding does not even attempt to argue that she has more of it than Nayak-Rhodes.